# PARK RAPIDS LUMBER COMPANY v. ÆTNA INSURANCE COMPANY and Others.[1]

May 14, 1915.

Nos. 19,121—(76).

**Fire insurance.**
   1. Evidence considered and *held* to sustain a finding of the trial court that certain policies of insurance did not cover the property destroyed by a fire.

**Exclusion of evidence.**
   2. There was no prejudicial error in excluding certain evidence.

[1] Reported in 152 N. W. 732.

Action in the district court for Hennepin county against 30 insurance companies to recover $8,300 for lumber destroyed by fire. The case was tried before Leary, J., who made findings and ordered judgment against two of the defendants and in favor of the other defendants. Plaintiff's motion for amended findings was denied. From an order denying plaintiff's motion for judgment in its favor as demanded in the complaint or for a new trial, it appealed. Affirmed.

*Powell & Simpson* and *Ernest C. Carman,* for appellant.

*Kerr, Fowler & Furber, Harrison L. Schmitt,* and *Butler & Mitchell,* for respondents.

BUNN, J.

Plaintiff was the owner of a sawmill, planing-mill, and lumber-yard and stock of lumber in the village of Park Rapids. Defendants are fire insurance companies, which had outstanding policies on the stock of lumber in the yards at the date of a fire in July, 1910, which destroyed lumber in the shed hereafter mentioned. The extent of the loss was $8,300. This action was to recover this loss. The defense was that the policies did not cover the lumber contained in this shed. The case was tried to a court without a jury and resulted in a decision in favor of defendants other than Fire Association of Philadelphia and Insurance Company of North America, the policies of these companies expressly covering the lumber destroyed. A motion to amend the findings was denied, as was a motion for a new trial, and plaintiff appealed to this court.

The ultimate question here, as it was in the trial court, is whether the destroyed lumber was covered by the policies of the defendants other than the two companies named. Insofar as this question is one of fact, of course we must give the usual weight to the findings of the court below. The facts found by the trial court and upon which its decision was based are as follows:

The plant of plaintiff covers a quarter section of land. In the northwesterly corner there is a large sawmill, where logs were sawed into lumber, timber, posts, pickets, lath, shingles and other timber

products. This lumber, timber, etc., was sawed in the rough and immediately thereafter piled in plaintiff's lumber-yards, which comprised all of the quarter section except the sawmill, a planing-mill at the southerly end of the property and a lumber-shed situated 40 feet from the planing-mill. The planing-mill was used by the plaintiff to finish and manufacture into finished products the rough lumber that came from the mill. Along it was a loading platform adjacent to tracks of the Great Northern Railway Co. which ran through the premises in approximately a northerly and a southerly direction. The lumber shed which contained the lumber destroyed by the fire was a rectangular one and one-half story structure 50 feet wide and 150 feet long. It stood 40 feet away from the planing-mill and was parallel with it. The space between the shed and the planing-mill for one-third of the distance from the westerly ends of the structures was entirely covered by the platform before mentioned, as was the entire space between them and the railroad tracks. The finished products were run out from the planing-mill on the loading platform and from there loaded onto railroad cars. Surplus finished products, not required to fill orders for shipment, were stored in the lumber-shed. At the time of the fire there were so stored in the lumber-shed finished products of the value of $7,171.79, which were totally destroyed. There was also destroyed finished material of the value of $721.35 on carts on the loading platform and damage to the extent of $256 was done to wagons and handling apparatus on the platform and in the planing-mill and the platform itself was damaged to the extent of $150.86.

As to the insurance policies. Several years before the fire each of the defendant companies issued a policy which described the property insured as follows: "On lumber (lath and shingles, if any), owned by the Park Rapids Lumber Company or held in trust or on commission, or sold but not delivered, piled in their yards situated on the southwest quarter of section 24, township 140, range 35, as shown on page No. 5 of the Sanborn-Perris Insurance Map of Park Rapids, Minnesota."

Two of the companies also issued policies expressly covering lumber

in the shed and nothing else, the description of the property insured being as follows:

"On lumber, lath, shingles and moulding while contained in the one story frame shingle roof building, 50 x 100 feet, situated in the southwest quarter of section 24, township 140, range 35, as shown on page 5 of the Sanborn-Perris Insurance Map of Park Rapids, Minnesota."

These two policies, each for $1,000, were in force at the time of the fire. Each contained a clause permitting concurrent insurance of only $4,000. The rate of premium charged and paid on these two policies, was $4.37 for each $100 of insurance.

The policies covering "lumber piled in the yards" aggregated over $200,000 in amount. In June, 1911, the insured being in doubt as to whether these policies covered "wood," as well as lumber, and desiring a form which would remove these doubts and "cover everything," the description in each policy of the property covered was changed to read as follows:

"On lumber, timbers, posts, pickets, lath, shingles, and other lumber and timber products   *   *   *   *while piled in its lumber yards and in sheds therein,* or loaded in or on cars, carts, wagons, or other vehicles therein or adjacent thereto; including tramways, platforms, and all fixtures and attachments belonging to the same, lumber handling and hoisting apparatus, cars, carts, wagons and other vehicles   *   *   *   situate on the southwest quarter of section 24, township 140, range 35, as shown on page 5 of the Sanborn-Perris Insurance Map of Park Rapids, Minnesota. Watchman service for the protection of the property is maintained during nights, Sundays and holidays, as per Watchman Clause attached."

At the written request of the plaintiff and in consideration of a reduction in premium, each policy contained after the description above quoted, the following "Clear Space Clause."

"The rate of premium upon the within policy has been reduced from the sum of $3.60 to the sum of $2.20, and in consideration of such reduction the assured agrees that a continuous space of 200 feet shall hereafter at all times be maintained between the property insured and any wood working or manufacturing establishment; said

space shall, in all cases, exclude and be measured from the exterior boundary of any permanent structure or addition connected with or attached to sawmill and planing-mill; said space not to be occupied by any independent or disconnected building structure or by accumulation of combustible materials of any kind, and except the loading and unloading * * * of transportation of lumber or timber products across such clear space. It shall not be used for handling, piling or sorting lumber for temporary purposes or otherwise. * * * Failure upon the part of the insured to comply with the terms of this clause shall not avoid this policy nor in any manner lessen the liability of the company hereunder, but in case of such failure the assured shall be liable to the company for the difference in the premium hereinbefore set forth."

Each policy contained a "Watchman Clause" by which the assured agreed in consideration of a reduction in the premium from $2.20 per hundred to $2 per hundred, to maintain a constant and uniform watch service in connection with the premises. Failure to do so did not avoid the policy but rendered the assured liable to pay the difference in premium.

There was also a co-insurance clause in each policy, in consideration of which the premium was further reduced to $1.80 per hundred, which was the rate agreed upon and charged on each of these general policies. As stated before, the rate charged for the two policies specifically insuring the lumber in the shed was $4.37 per hundred. The general policies permitted unlimited concurrent insurance, while the specific policies permitted but $4,000 concurrent insurance. The Sanborn-Perris Insurance Map, referred to in each of the policies, showed a clearly defined "clear space" of 200 feet between each pile of lumber in the yards and the planing-mill or the sawmill. It showed no such clear space between the planing-mill and the shed which contained the finished lumber which was destroyed and which was but 40 feet from the planing-mill and connected with it by the platform before mentioned. The map also noted that no watchman was kept at the planing-mill.

The above are the evidentiary facts upon which the trial court based its finding that the policies of insurance, hereinbefore referred

to as the "general policies," did not cover the property destroyed and were not intended to cover such property, and its conclusion of law that plaintiff was not entitled to recover on said policies.

Is this decision sustained by the evidence? The question is one partly of fact and partly of law. If its solution depended alone upon the construction of the language in the policies describing the property insured, it would be a matter of pure law. But if we are to determine the intention of the parties not alone from the language employed, but from that language construed in the light of all the surrounding facts and circumstances, the question becomes largely one of fact. Such we think is the situation. The language employed, especially when we consider the subject matter and the surrounding circumstances, is not so clear and free from ambiguity that we can say as a matter of law that it was intended to insure the particular lumber destroyed. It is true that it described the property insured as "lumber, timbers," etc., "and other lumber and timber products," "while piled in its lumber yards and in sheds therein, or loaded in or on cars." The insurance map referred to in the description shows but one "shed" on the premises, and there was but one in fact, the shed which contained the lumber destroyed. This shed was not used to house the rough lumber that came from the sawmill, which was uniformly piled in the yards, but only to take care of the surplus finished lumber that came from the planing-mill and was not needed to fill orders for shipment. The more important evidentiary facts which make doubtful the intention of the parties, which make the question one of fact, and which tend to support the decision of the trial court, may be summarized as follows:

Two of the companies issued policies specifically covering the lumber in this shed. These same companies also issued policies covering lumber "while piled in its lumber yards and in sheds." The difference in the description of the property insured is most marked.

The rate on the two specific policies was three times that charged on the general policies.

The former permitted but $4,000 concurrent insurance, while the general policies aggregated over $200,000 and permitted unlimited concurrent insurance.

The "clear space" clause of the general policies, upon the observance of which depended a substantial reduction of the premium rate, was flagrantly and continuously violated, if the policies covered the lumber in the shed. The situation in this regard existed at the time the policies were issued and at all times thereafter, to the knowledge of all parties. The significance of this feature of the case as indicating the intention of the parties is greater here than in the case of Wild Rice Lumber Co. v. Royal Ins. Co. of Liverpool, 99 Minn. 190, 108 N. W. 871. If the clear space clause in that case then unauthorized by statute, showed that the parties did not intend to insure lumber piled within 200 feet of the mill, though the description of the insured property, read literally, covered all lumber in the yards and in the mill itself, the clear space clause in this case certainly tends to show that the policies were not intended to cover the lumber in this shed, which was but 40 feet from the planing mill. We are asked to overrule the Wild Rice case, but must decline to do so. It is very much in point here, if not absolutely controlling. We see little force in the contention that defendants are estopped from relying upon the "clear space clause" in urging their claim that the property destroyed was not covered by the policies. Their knowledge that there was no clear space between the planing-mill and the shed might show a waiver of the clause if a violation thereof was urged to defeat a recovery, but it shows nothing in the way of a practical construction of the language describing the property insured, and the question of estoppel or of waiver is not in the case.

The watchman clause in the general policies is absent from the two policies specifically covering the lumber in the shed, and the insurance map shows that there was no watchman service at the planing-mill adjacent to the shed and no fire apparatus. The general policies provide that "watchman service for the protection of the property is maintained during nights, Sundays and holidays."

Plaintiff relies greatly on the language "lumber  *  *  *  while piled in its lumber yards and in sheds therein," and the fact that there was no other lumber shed on the premises. There is force in the argument drawn from these premises, but it is not convincing under the circumstances. The plural is used instead of the singular,

tending to indicate that the particular building was not in mind. Perhaps this building, which was of a more substantial character than the sheds usually covering lumber in yards, was not regarded as a "shed." It was not situated in the open where lumber was piled, and may have been considered to be rather an adjunct of the planing-mill. It is worthy of note also that this building was not called a "shed" in the two specific policies but was described as a "one story shingle-roof building."

We have given due weight to the argument drawn from the change in the description of the property insured, as well as to the language of the policies and the other reasons urged for reversal. The case is perhaps a close one, but on the whole evidence we are unable to say that the trial court was wrong in holding that the destroyed lumber was not covered by the general policies.

There was no prejudicial error; if error at all, in sustaining defendants' objections to certain questions asked of the witness Chapman as to conversations with defendants' agent before the policies were written, or in striking out an answer of the witness.

The order appealed from is affirmed.